**EXHIBIT 1**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**N.E.R.D. MUSIC, LLC**

**Effective date: September 1, 2017**

THE LIMITED LIABILITY COMPANY INTERESTS (THE "UNITS") ISSUED IN ACCORDANCE WITH THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**EXHIBIT 1**

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINED TERMS ..................................................................................................... 1

    Section 1.1.    Definitions ......................................................................................... 1

ARTICLE 2 FORMATION OF COMPANY AND TERM ............................................................. 8

    Section 2.1.    Formation of Company. ...................................................................... 8
    Section 2.2.    Name .................................................................................................. 8
    Section 2.3.    Term ................................................................................................... 8
    Section 2.4.    Registered Office; Registered Agent; Principal Office; Other Offices ................ 8
    Section 2.5.    No State Law Partnership ................................................................... 9
    Section 2.6.    Qualification in Other Jurisdictions .................................................. 9
    Section 2.7.    Performance of Members ................................................................... 9
    Section 2.8.    Incidental Rights ............................................................................... 9

ARTICLE 3 PURPOSE AND POWERS OF THE COMPANY ................................................... 10

    Section 3.1.    Purpose ............................................................................................ 10
    Section 3.2.    Powers of the Company ................................................................... 10

ARTICLE 4 CAPITAL CONTRIBUTIONS, MEMBER INTERESTS, CAPITAL ACCOUNTS ...................... 12

    Section 4.1.    Capital Contributions ...................................................................... 12
    Section 4.2.    Member's Interest ............................................................................ 12
    Section 4.3.    Status of Capital Contributions. ...................................................... 12
    Section 4.4.    Capital Accounts .............................................................................. 12
    Section 4.5.    Election for Profits Interests ............................................................ 13
    Section 4.6.    Noncompensatory Options ............................................................... 14

ARTICLE 5 MEMBERS, MEETINGS AND AMENDMENTS ................................................. 14

    Section 5.1.    Powers of Members ......................................................................... 14
    Section 5.2.    Resignation ...................................................................................... 14
    Section 5.3.    Meetings or Other Approvals of the Members ............................... 14
    Section 5.4.    Additional Members; Additional Units. .......................................... 15
    Section 5.5.    Amendments ..................................................................................... 16~~15~~
    Section 5.6.    Confidentiality Obligations of Members ......................................... 16

ARTICLE 6 MANAGEMENT ...................................................................................................... 16

    Section 6.1.    Management of the Company .......................................................... 16
    Section 6.2.    Reliance by Third Parties ................................................................. 17
    Section 6.3.    Officers ............................................................................................ 17

ARTICLE 7 ASSIGNABILITY OF MEMBER INTERESTS ...................................................... 18

    Section 7.1.    Assignability of Interest .................................................................. 18
    Section 7.2.    Permitted Transfers. ........................................................................ 18
    Section 7.3.    Recognition of Assignment by Company or Other Members ......... 19
    Section 7.4.    Effective Date of Assignment ......................................................... 19
    Section 7.5.    Limitations on Transfer .................................................................. 19

ARTICLE 8 DISTRIBUTIONS TO MEMBERS .......................................................................... 20

    Section 8.1.    Net Cash Flow ................................................................................. 20
    Section 8.2.    Tax Distributions ............................................................................. 20
    Section 8.3.    Withholding ..................................................................................... 20
    Section 8.4.    Limitations on Distribution ............................................................. 21

*i*

**EXHIBIT 1**

**ARTICLE 9 TAX ALLOCATIONS** ........................................................................................... 21

    Section 9.1.    Profits and Losses ........................................................................ 21
    Section 9.2.    Special Allocations ....................................................................... 22
    Section 9.3.    Allocation and Other Rules. ......................................................... 23

**ARTICLE 10 BOOKS AND RECORDS** .................................................................................. 24

    Section 10.1.    Inspection Rights Pursuant to Law ............................................. 24
    Section 10.2.    Books and Records ...................................................................... 24
    Section 10.3.    Annual Financial Statements ...................................................... 25
    Section 10.4.    Quarterly Statements ................................................................... 25
    Section 10.5.    Accounting Method ..................................................................... 25

**ARTICLE 11 TAX MATTERS** ............................................................................................... 25

    Section 11.1.    Taxation as Partnership .............................................................. 25
    Section 11.2.    Federal Tax Returns .................................................................... 25
    Section 11.3.    Member Tax Return Information .................................................. 25
    Section 11.4.    Tax Matters Member. .................................................................. 25
    Section 11.5.    Partnership Tax Audit Rules ....................................................... 26
    Section 11.6.    Right to Make Section 754 Election ........................................... 27

**ARTICLE 12 LIABILITY, EXCULPATION AND INDEMNIFICATION** ..................................... 27

    Section 12.1.    Liability. ...................................................................................... 27
    Section 12.2.    Exculpation. ................................................................................ 27
    Section 12.3.    Indemnification ........................................................................... 28
    Section 12.4.    Expenses ..................................................................................... 28
    Section 12.5.    Insurance ..................................................................................... 29
    Section 12.6.    Certain Liabilities ....................................................................... 29
    Section 12.7.    Acts Performed Outside the Scope of the Company .................... 29
    Section 12.8.    Liability of Members to Company ............................................... 29
    Section 12.9.    Attorneys' Fees ........................................................................... 29
    Section 12.10.    Subordination of Other Rights to Indemnity .............................. 29
    Section 12.11.    Survival of Indemnity Provisions. .............................................. 29

**ARTICLE 13 DISSOLUTION, LIQUIDATION AND TERMINATION** ....................................... 30

    Section 13.1.    No Dissolution ............................................................................. 30
    Section 13.2.    Events Causing Dissolution ......................................................... 30
    Section 13.3.    Notice of Dissolution .................................................................. 30
    Section 13.4.    Liquidation .................................................................................. 30
    Section 13.5.    Termination ................................................................................. 30
    Section 13.6.    Claims of the Members or Third Parties ..................................... 31
    Section 13.7.    Distributions In-Kind. ................................................................. 31

**ARTICLE 14 REPRESENTATIONS AND WARRANTIES OF MEMBERS** ................................ 31

    Section 14.1.    Representations and Warranties of Members .............................. 31

**ARTICLE 15 MISCELLANEOUS** ........................................................................................... 32

    Section 15.1.    Notices ........................................................................................ 32
    Section 15.2.    Failure to Pursue Remedies ........................................................ 32
    Section 15.3.    Cumulative Remedies ................................................................. 33
    Section 15.4.    Binding Effect ............................................................................. 33
    Section 15.5.    Interpretation ............................................................................... 33
    Section 15.6.    Severability ................................................................................. 33
    Section 15.7.    Counterparts ................................................................................ 33
    Section 15.8.    Integration .................................................................................. 33

**EXHIBIT 1**

Section 15.9.    Governing Law .................................................................................... 33
Section 15.10.   Third Party Beneficiaries ................................................................... 33
Section 15.11.   Effect of Waiver or Consent ............................................................. 33
Section 15.12.   Election to Arbitrate .......................................................................... 33
Section 15.13.   Legal Counsel and Conflict Waiver ................................................. 34

**EXHIBIT 1**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**N.E.R.D. MUSIC, LLC**
**a Delaware limited liability company**

**Effective Date:** _____

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of **N.E.R.D. MUSIC, LLC**, a Delaware limited liability company (the "**Company**") is made and entered into and effective as of the effective date indicted below, by the Company and its Members, with reference to the recitals set forth below.

WITNESSETH

A.    On December 16, 2014 the Members filed the Certificate of Formation for the Company with the Delaware Secretary of State.

B.    In connection with the formation of the Company, a Limited Liability Company Operating Agreement of the Company, effective on or about December 16, 2014 (the "**Prior Agreement**"), was entered into by Pharrell Williams, Chad Hugo, and Sheldon Haley as the Members and Co-Managers of the Company.

C.    In connection with the above, the Members desire to amend and restate, in its entirety, the Prior Agreement through the adoption of this Agreement in order to amend the terms governing the membership, management and operation of the Company for all periods following the Effective Date.

NOW THEREFORE, the Members hereby agree as follows:

**ARTICLE 1**

**DEFINED TERMS**

Section 1.1.    Definitions. Unless the context otherwise requires, the terms defined in this Article 1 shall, for the purposes of this Agreement and the Schedules and Exhibits hereto, have the meanings herein specified or in the introductory paragraph of this Agreement or in Schedule A.

"Act" means the Delaware Limited Liability Company Act, Delaware Code Sections 18-101 et seq., as amended from time to time.

"Additional Members" means such Persons as may from time to time purchase Units of the Company as approved by the Managers.

**EXHIBIT 1**

"Adjusted Capital Account Deficit" means a deficit balance in a Member's Capital Account after giving effect to any amounts the Member is obligated to contribute or restore to the Company pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and subsequently such Member's share of the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Affiliate" means with respect to a Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise. Ownership of more than fifty percent (50%) of the beneficial interests of an entity shall be conclusive evidence that control exists. For purposes of this definition, "Affiliate" shall include, with respect to any natural Person, the spouse, parents, siblings and children of such Person.

"Agreement" means this limited liability company agreement, as amended, modified, supplemented or restated from time to time.

"Bankruptcy" means, with respect to a Member (a "Bankrupt Member") or the Company, the happening of any of the following: (i) the making of a general assignment for the benefit of creditors; (ii) the filing of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing an inability to pay debts as they become due; (iii) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating the Company or a Member to be bankrupt or insolvent; (iv) the filing of a voluntary petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) the filing of an answer or other pleading admitting the material allegations of, or consenting to, or defaulting in answering, an involuntary bankruptcy petition filed against the Company or a Member in any bankruptcy proceeding; (vi) the filing of a voluntary application or other pleading or any action otherwise seeking, consenting to or acquiescing in the appointment of a liquidating trustee, receiver or other liquidator of all or any substantial part of the Company's or a Member's properties; (vii) the commencement against the Company or a Member of any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation which has not been quashed or dismissed within one hundred eighty (180) days; or (viii) the appointment without consent of the Company or such Member or acquiescence in the appointment of a liquidating trustee, receiver or other liquidator of all or any substantial part of the Company's or a Member's properties without such appointment being vacated or stayed within ninety (90) days and, if stayed, without such appointment being vacated within 90 days after the expiration of any such stay.

"Business" shall have the meaning set forth in Section 3.1(a).

"Business Day" means a day other than a Saturday, Sunday or a legal holiday as recognized in the State of Delaware.

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with the provisions of Article 4 hereof.

**EXHIBIT 1**

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company pursuant to Article 4 hereof with respect to such Member's Interest, reduced, in the case of a contribution of property, by the amount of any liabilities of such Member that are assumed by the Company in connection with such contribution or that are secured by any property contributed by such Member to the Company. Only Williams may make Capital Contributions without the approval of the Managers or without the approval of the Members if the Act so requires. Otherwise, all Capital Contributions must be approved by a majority of the Managers.

"Certificate" means the Certificate of Formation of the Company filed with the Delaware Secretary of State on December 16, 2014 as may be amended from time to time.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement.

"Company" means N.E.R.D. MUSIC, LLC, a Delaware limited liability company.

"Company Minimum Gain" shall have the same meaning as the meaning of "partnership minimum gain" set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Company Nonrecourse Liability" shall have the same meaning as the meaning of "partnership nonrecourse liability" set forth in Treasury Regulations Section 1.704-2(b)(3).

"Confidential Information" means data and information relating to the Company and which has material value to the Company and is not generally known to its competitors. Confidential Information does not include any data or information that has been voluntarily disclosed to the public by the Company or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

"Covered Person" means a Member; any Affiliate of a Member; any officers, directors, shareholders, partners, employees, representatives or agents of a Member or any Affiliate of a Member; any employee or agent of the Company or its Affiliates; any Tax Matters Member; or an officer of the Company that is not an employee.

"Damages" shall have the meaning set forth in Section 12.2(a).

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

**EXHIBIT 1**

"<u>Family Member</u>" shall have the meaning given that term in <u>Section 7.2(a)</u>.

"<u>Fiscal Year</u>" means (i) the period commencing upon the formation of the Company and ending on December 31, 2016 and (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31.

"<u>Gross Asset Value</u>" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

      (a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the contributing Member and the Company;

      (b)    the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managers, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a <u>de minimis</u> Capital Contribution or in exchange for services; (ii) the distribution by the Company to a Member of more than a <u>de minimis</u> amount of Company assets as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); <u>provided</u>, <u>however</u>, that adjustments pursuant to Clause (i) and Clause (ii) of this sentence shall be made only if the Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

      (c)    the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Managers.

      (d)    The Gross Asset Values of Company assets shall be adjusted to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph (a) or Paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"<u>Gross Revenue</u>" means the gross revenue of the Company for each Fiscal Year, or part thereof, arising from the Company's business other than Capital Contributions and proceeds from loans.

"<u>Indemnitee</u>" shall have the meaning given that term in <u>Section 12.3</u>.

"<u>Indemnitor</u>" shall have the meaning given that term in <u>Section 12.3</u>.

**EXHIBIT 1**

"Interest" means, with respect to any Member, such Member's: (i) interest in the Company's capital which may be represented in terms of percentage or units ("Units"), (ii) share of the Company's net Profits and net Losses (and specially allocated items of income, gain, and deduction), and the right to receive distributions of Net Cash Flow from the Company, (iii) right to inspect the Company's books and records, to the extent permitted by this Agreement, and (iv) right to participate in the management of and vote on matters coming before the Members as provided in this Agreement.

"Interest Holder" shall have the meaning set forth in Section 7.1.

"Liquidating Trustee" shall have the meaning set forth in Section 13.4.

"Manager" or "Managers" shall mean any individual elected by the majority consent of the Members to serve as Manager and any individual assigned the duties of Manager as set forth in Section 6.2. The initial Managers are Pharrell Williams, Chad Hugo and Sheldon Haley.

"Member" means any Person executing this Agreement and any Person admitted as a Member pursuant to the provisions of this Agreement, in such Person's capacity as a Member of the Company, and "Members" means two (2) or more of such Persons when acting in their capacities as Members of the Company.

"Member Nonrecourse Debt" has the meaning set forth for "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" shall have the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i)(2).

"Minimum Distributions" shall have the meaning set forth in Section 8.2.

"Net Cash Flow" means, for each calendar month, Fiscal Year or other period of the Company for which it must be determined, the Gross Revenue of the Company from all sources, less all Operating Expenditures, provided that Net Cash Flow shall not include unexpended Capital Contributions or loan proceeds unless determined by the Manager.

"Non-Exculpated Action" shall have the meaning set forth in Section 12.2.

"Officers" shall mean one or more officers as may be designated by the Manager as set forth in Section 6.5, including a Chief Executive Officer, Chief Operating Officer, Chief Information Officer and/or Chief Financial Officer, and any other officers designated by the Manager in accordance with this Agreement.

"Operating Expenditures" means the expenditures of the Company for each Fiscal Year, or part thereof, arising from the Company's business, including, but not limited to, the following:

a)    general operating expenses including, but not limited to, management, legal, accounting and other professional fees, wages, salaries and other compensation in connection with its business operations, and all fees, costs and expenses associated with entitlement, development, construction, and marketing with respect to property, monies

**EXHIBIT 1**

expended to comply with and perform contractual and other obligations, and any other expenses expended on behalf of the Company in relation to its general administrative and management needs;

        b)      payments of principal and interest upon any indebtedness of the Company (whether third-party indebtedness or loans made by Members to the Company pursuant to this Agreement);

        c)      any other cash expended by the Company for business operations, including, without limitation, capital expenditures; and

        d)      the establishment of appropriate reserves for debt service, to provide working capital or any other contingency of the Company as determined by the Managers.

"Partnership Tax Audit Rules" means Sections 6221 through 6241 of the Code, as amended by the Bipartisan Budget Act of 2015, together with any guidance issued thereunder or successor provisions and any similar provision of state or local tax laws.

"Partnership Representative" means the person designated as the partnership representative pursuant to the Partnership Tax Audit Rules.

"Percentage Interest" means a Member's Percentage Interest as described in **Schedule A**, as amended from time to time.

"Permitted Action" shall have the meaning set forth in Section 3.1(b).

"Permitted Assignee" shall have the meaning given that term in Section 7.2(a).

"Person" includes any corporation, association, partnership (general or limited), joint venture, partnership, trust, estate, limited liability company, individual (including personal representatives, executors and heirs of a deceased individual), trustee, receiver or liquidator or other legal entity or organization.

"Profits" or "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

        a)      any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

        b)      any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

**EXHIBIT 1**

c)      in the event the Gross Asset Value of any Company asset is adjusted in accordance with Paragraph (b) or Paragraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

d)      gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

e)      in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" above; and

f)      notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 9.2 hereof shall not be taken into account in computing Profits or Losses.

"Regulatory Allocations" shall have the same meaning given that term in Section 9.2(j).

"Reserve Amount" shall have the same meaning given that term in Section 8.1.

"Safe Harbor Election" shall have the same meaning given that term in Section 4.6.

"Tax Matters Member" shall have the meaning set forth in Section 11.4(a), hereof.

"Transfer" means any transfer, assignment, sale, conveyance, hypothecation, license, lease, partition, pledge, grant of an option or grant of a security interest in a Member's Interest in the Company, and includes any "involuntary transfer" such as a sale of any part of the Interest therein in connection with any bankruptcy or similar insolvency proceedings, or any other disposition or encumbrance of a Member's Interest including any transfer by reason of a Member's death. For purposes of this Agreement, any transfer, exchange or series of transfers (or exchanges), directly or indirectly, of the stock, partnership, member or other ownership interests of any Member that is a business organization or an entity (or any combination of such transfers or exchanges, whether direct or in connection with a merger, acquisition, sale, or similar reorganization or transaction, including issues of new stock or other ownership interests, or the exercise of options, warrants, debentures or other convertible instruments, or a redemption of other interests in the Member, and any similar transactions involving the stock or other ownership interests of such Member), the effect of which is that the Persons who owned more than fifty (50%) of the outstanding stock or other ownership interests in such Member at the time this Agreement is signed, no longer own more than fifty percent (50%) of such stock or other ownership interests, then a Transfer shall also be deemed to have occurred with regard to the Interest owned by such Member.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**EXHIBIT 1**

"Units" means units representing an ownership interest in the Company and may be expressed as a percentage interest in lieu of units.

"Unrecovered Capital" means with respect to each Member, the aggregate Capital Contributions of a Member reduced by distributions pursuant to Section 8.1(a).

## ARTICLE 2

## FORMATION OF COMPANY AND TERM

Section 2.1.    Formation of Company.

(a)    The Members hereby agree to form the Company as a limited liability company pursuant to the provisions of the Act, and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. An authorized person has previously filed the Certificate.

(b)    The name and mailing address of each Member, the total amount contributed to the capital of the Company and Capital Accounts of the Members as of the date of this Agreement are listed on Schedule A attached hereto. The Manager shall update Schedule A, from time to time, as may be necessary to accurately reflect the agreements of the Members with respect to the information therein. Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A, as amended and in effect from time to time.

Section 2.2.    Name. The business and affairs of the Company shall be conducted under the name "N.E.R.D. MUSIC, LLC" unless the Managers determine to use a different name. The Company's officers shall execute such assumed or fictitious name statements as may be desirable or required by law to be filed in connection with the formation of the Company and shall cause such statements to be filed in all appropriate public records.

Section 2.3.    Term. The term of the Company commenced on the date the Certificate was filed and shall continue as provided in Section 13.2, unless the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.4.    Registered Office; Registered Agent; Principal Office; Other Offices. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law. The principal office of the Company shall be at such place as the Managers may  designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there. The Company may have such other offices as the Managers may designate from time to time.

**EXHIBIT 1**

Section 2.5.    <u>No State Law Partnership</u>. The Company is a Delaware limited liability company that will be treated as a partnership only for federal income tax purposes, and if applicable, state tax purposes and no Member shall be deemed to be a partner or joint venturer of any other Member, for any purposes other than federal income tax purposes and, if applicable, state tax purposes, and this Agreement shall not be construed to suggest otherwise. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

Section 2.6.    <u>Qualification in Other Jurisdictions</u>. The Managers shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business. The officers of the Company shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

Section 2.7.    <u>Performance of Members</u>.    Each Member hereby agrees that such Member shall perform on behalf of the Company all personal services which the Company shall reasonably request as defined in this Section 2.7 (the "**Services**") and in connection with this Agreement.    For purposes hereof, the Services of each Member in connection with this Agreement refer to Services in association with the musical group known as N*E*R*D (the "**Group**") which shall include, without limitation, any and all personal appearances in musical concerts and any other entertainment event of any kind, nature or description, motion pictures, film and live television, all fields of recording, including, without limitation, the recording of commercial phonograph records, tapes and audio-visual recordings, or other reproductions by any method existing presently or in the future, merchandising, commercials, commercial tie-ups, endorsements, and any other activities customarily deemed within the entertainment field (excluding songwriting and music publishing), as well as any and all related or incidental activities in connection with the advertising, exploitation or advancement of the aforesaid areas of endeavor or the results and proceeds of any of the aforesaid Services.    Each Member further represents and warrants that he has neither made nor will make any contractual or other commitment which would materially interfere to any substantial degree with the nature of or full and complete performance of his services in connection with the Group.    Each Member further represents and warrants that he must be present, able, and willing to perform the Services at each venue described herein in order to receive his pro rata share of distributions set forth in Article 8 below, based on the revenue from that event, including without limitation any merchandise, trademark or sponsorship revenue in connection with any such Services. Failure to perform any service of which a Member has not been afforded reasonable notice however, shall not constitute a breach hereof.

Section 2.8.    <u>Incidental Rights</u>    Each Member hereby grants to the Company, at no cost, the worldwide right in perpetuity to use and to authorize third parties to use and to display his name (both legal and professional), voice, approved likeness and biographical materials concerning him in connection with the Group and business of the Company.    Said right of the Company shall be nonexclusive.    Each Member further agrees that he shall not use, exploit, commercialize, transfer or attempt to transfer any right, privilege, title or interest in the

**EXHIBIT 1**

name of the Group or any reference to the Group therein apart from the Services rendered to the Company, or with regard to his name, voice, likeness or biographical materials concerning him in connection with the Group and business of the Company, nor shall any Member grant such right, authorize, or willfully permit any person, firm or corporation to infringe upon any such right hereby granted to the Company, and each such Member hereby authorizes the Company, in his name or otherwise, to institute any legal proceeding or proceedings to prevent such infringement.

**ARTICLE 3**

**PURPOSE AND POWERS OF THE COMPANY**

Section 3.1.    Purpose.

(a)    The purpose of the Company is to engage in the business of music performance, touring, merchandising, entertainment services as the recording artist professionally known as N.E.R.D, and any lawful activities reasonably related thereto (the "Business").  In clarification thereof all other activities of the Members shall not be subject to this agreement.

(b)    In no event shall this Agreement be held or construed to imply the existence of a general partnership or joint venture among the Members with regard to matters, trades or businesses or enterprises, and no Member shall have any power or authority under this Agreement to act as the agent or representative of the Company or any other Member with regard to any matter, or as the agent or representative of any other Member on any matter. Without limiting the foregoing, and notwithstanding any other provision of this Agreement, the Members specifically acknowledge and agree that (i) the officers and Managers shall only be required to spend such time on the affairs of the Company as is reasonably necessary to perform their duties and obligations hereunder and shall not be required to manage the Company as their sole and exclusive function and may engage in other business and investment activities, and (ii) neither the Company nor any Member shall have any right, solely by virtue of this Agreement or its relationship to the other Members, the Officers or the Company, to share or participate in any such other investments or activities of the Members, the Officers or their respective Affiliates or to the income or proceeds derived therefrom (each, a "Permitted Action"). The provisions of this Section 3.1(b), to the extent that they limit or restrict the duties and/or liabilities of a Member or Officers otherwise existing at law or in equity, are agreed by the Members and Officers to replace such other duties and/or liabilities to the fullest extent permitted by applicable law.

Section 3.2.    Powers of the Company. Subject to the consent of the Managers, and as set forth more fully in Article 6, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 3.1, including, but not limited to, the power:

(a)    to conduct the business of the Company, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any

**EXHIBIT 1**

state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(b)    to enter into commercial contracts and agreements, including, but not limited to license, purchase, or other agreements relating to the intellectual property of third parties, including but not limited to trademarks and copyrights convenient or incidental to the accomplishment of the purpose of the Company. For purposes of clarity and the avoidance of doubt, the Company shall not hold any ownership right, title, or interest in trademarks, songwriting, publishing, recordings, copyrights in compositions, or property relating to the entity name or related intellectual property, all of which such rights will be owned and controlled by Williams (the "**Excluded Property**"), and as such, the Members agree that all control, right, title, and interest regarding the Excluded Property shall at all times herein remain separate, apart, and expressly excluded from this Agreement. Notwithstanding the terms contained in this Section 3.2(b): (1) nothing shall preclude Williams from granting a non-exclusive license to use any of the Excluded property to the Company pursuant to a separate agreement; (2) all revenues and expenses in connection with Williams's N*E*R*D trademarks, recordings, and property relating to the entity name or related intellectual property will be included when calculating Net Cash Flow pursuant to Article 8, below; (3) the sound recording copyrights in those recordings embodied on the 2017 album titled "No One Ever Really Dies" will be owned by the LLC.

(c)    to enter into, perform and carry out contracts of any kind, including contracts with any Member or Affiliate thereof, necessary to the accomplishment of the purpose of the Company;

(d)    to sue and be sued, make claims and defend, and participate in administrative or other proceedings, in its name;

(e)    to appoint agents of the Company, and define their duties and fix their compensation;

(f)    subject to the provisions of Article 12, to indemnify certain Persons in accordance with the Act and to obtain any and all types of insurance;

(g)    to borrow money and issue evidences of indebtedness, including loans from any Member or Affiliate thereof, and to secure any of the same by a deed of trust, mortgage, pledge or other lien on the assets of the Company;

(h)    to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities; and

(i)    to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company.

**EXHIBIT 1**

## ARTICLE 4

### CAPITAL CONTRIBUTIONS, MEMBER INTERESTS, CAPITAL ACCOUNTS

Section 4.1.    Capital Contributions.

(a)    As of the date hereof, each of the Members has contributed or agreed to contribute capital as described in Schedule A in exchange for the number of Units set forth on Schedule A. Except as set forth on Schedule A, Members shall not be required to contribute additional Capital Contributions. For purposes of clarity, and removal of doubt, no assets of any kind of Pharrell Williams ("**Williams**") Chad Hugo, or Sheldon Haley have been contributed nor have been pledged as capital except as set forth in Schedule A.

(b)    The Managers may, in their sole discretion, accept additional Capital Contributions in accordance with Section 5.4.

Section 4.2.    Member's Interest. A Member's Units shall for all purposes be personal property. A Member has no interest in specific property, unless and until distributed to such Member. For the purpose of clarity, and avoidance of doubt, no Member shall have any ownership, right, title or interest in any publishing, songwriting, copyrights in any compositions, trademarks, or other intellectual property by virtue of being a Member.

Section 4.3.    Status of Capital Contributions.

(a)    Except as otherwise provided in this Agreement, no Member, or the successor or assign of a Member, may demand a return of its Capital Contributions, in whole or in part.

(b)    No Member or Affiliate thereof shall receive any interest, return, compensation or drawing with respect to its Capital Contributions or its Capital Account or for services rendered or resources provided on behalf of the Company, except as otherwise specifically provided in this Agreement.

(c)    No Member shall have any personal liability for the repayment of any other Member's Capital Contribution.

Section 4.4.    Capital Accounts.

(a)    A separate Capital Account shall be established and maintained for each Member. The original Capital Account established for any Member who acquires Units by virtue of an assignment in accordance with the terms of this Agreement shall be in the same amount as and shall replace the Capital Account of the assignor of such Units, and, for purposes of this Agreement, such Member shall be deemed to have made the Capital Contributions made by the assignor of such Units (or made by such assignor's predecessor in interest). To the extent such Member acquires less than all of the Units of the assignor of the Units so acquired by such Member, the original Capital Account of

**EXHIBIT 1**

such Member and its Capital Contributions shall be in proportion to the Units it acquires, and the Capital Account of the assignor who retains Units, and the amount of its Capital Contributions, shall be reduced in proportion to the Units it retains.

(b)    The Capital Account of each Member shall be maintained in accordance with the following provisions:

(i)    to such Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits, special allocations of income and gain, and the net amount of any Company liabilities that are assumed by such Member or that are secured by any Company assets distributed to such Member;

(ii)    to such Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company assets distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses, special allocations of loss and deduction, and the net amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company; and

(iii)    in determining the amount of any liability for purposes of this Section 4.4(b), there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the Treasury Regulations.

Section 4.5.    Election for Profits Interests.

(a)    By executing this Agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice") apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company. For purposes of making such Safe Harbor election, the Tax Matters Member is hereby designated as the "partner who has responsibility for U.S. federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Tax Matters Member constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including, without limitation, the requirement that each Member shall prepare and file any U.S. federal income tax returns such Member is required to file reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Company in a manner consistent with the requirements of the IRS Notice. A Member's obligations to comply with the requirements of this Section 4.5 shall survive such Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section 4.5, the Company shall be treated as continuing in existence. Each Member authorizes the Tax Matters Member to amend this Section 4.5 to the extent necessary to achieve similar tax treatment with respect to any interest in the Company transferred to a service provider by the Company in connection

**EXHIBIT 1**

with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent U.S. Department of Treasury or Internal Revenue Service guidance).

(b)   In the event of forfeiture of any Units, the Company shall conform to requirements of the Treasury Regulations with respect to allocations of Profits and Losses.

Section 4.6.   <u>Noncompensatory Options</u>. In the event that the Company issues noncompensatory options, including debt instruments convertible into Units, the following shall apply. In the event of any adjustment to Gross Asset Value of the assets of the Company, the Company shall apply the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(d)(4) and (h)(1)-(2). In the case of the exercise of a noncompensatory option or right of conversion in a debt instrument, the Company shall comply with Treasury Regulation Section 1.704-1(b)(2)(iv)(s) and shall make the allocations described in Treasury Regulations Section 1.704-1(b)(4)(ix)-(x) to the extent required.

## ARTICLE 5

## MEMBERS, MEETINGS AND AMENDMENTS

Section 5.1.   <u>Powers of Members</u>. The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

Section 5.2.   <u>Resignation</u>. Except as expressly provided in this Agreement, a Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company. If a Member resigns or withdraws in violation of the foregoing prohibition, such Member shall not be entitled to receive any compensation, shall not be able to exercise any of the rights granted to such Member under this Agreement, shall not be relieved of any obligations under this Agreement and shall not receive any distribution from the Company, other than such Member shall receive on liquidation of the Company the amount of its Capital Account as of the date of such resignation or withdrawal, and shall not receive any allocation of Profits after the date of such resignation or withdrawal or a lesser amount if the fair market value of the Company is less than the balances in the Capital Accounts. Such Member shall not otherwise be entitled to receive any amount with respect to its Interest except as expressly provided for in Section 13.4 of this Agreement.

Section 5.3.   <u>Meetings or Other Approvals of the Members</u>.

(a)   Meetings of the Members may be called at any time by the Managers or any Member or Members collectively holding at least 25% of the outstanding Units.

(b)   Each meeting of the Members shall be called with at least five (5) Business days but not more than thirty (30) Business days written notice, specifying the agenda for the meeting. Such notice may be waived by a Member at any time, and will be deemed to have been waived if the Member participates in the meeting and has been

**EXHIBIT 1**

provided with a written agenda for the meeting. Meetings may also be held telephonically whereby each of the Member can hear each of the other Members. The Members shall establish all other provisions relating to meetings of Members, including the time, place or purpose of any meeting at which any matter is to be voted on by any Members, voting in person or by proxy or any other matter with respect to the exercise of any such right to vote. Action by the Members may also be taken and represented by a written consent of the Members having the percentage points of the Percentage Interest required for such action pursuant to this Agreement signed by the Members. The Company's Secretary or such other officer designated by the Members shall be responsible for taking minutes of the Member meetings and safekeeping them on behalf of the Company, if requested to do so, by the Members.

Section 5.4.    Additional Members; Additional Units.

(a)    The Company is authorized to admit any Person as an additional member of the Company (each, an "Additional Member" and collectively, the "Additional Members") or to issue additional Units to an existing Member. Upon the unanimous consent of the Managers, each such Person shall be admitted as an Additional Member at the time such Person (i) executes a signature page or joinder agreement, agreeing to be bound by this Agreement, and (ii) is designated as a Member (with a corresponding Percentage Interest) on an amended or supplemental Schedule A hereto. The Managers unanimously may issue Units to an existing Member or to an Additional Member in exchange for cash, property or services or any combination thereof, upon passage of a resolution. So as to be free from doubt, such new Additional Members, such additional Units issued to existing Members shall (i) be entitled to such distributions pursuant to Article 8 and allocations pursuant to Article 9 of this Agreement as the Managers unanimously determine, including, without limitation, distributions and allocations that are senior to one or more classes of units outstanding at the time of the issuance of such Units and (ii) shall dilute the existing Members Percentage Interests proportionately.

(b)    Additional Members shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits or other items; provided that, subject to the restrictions of Section 706(d) of the Code, Additional Members shall be entitled to their respective share of the Company's income, gains, losses, deductions, credits and other items arising under contracts entered into before the effective date of the admission of any Additional Members to the extent that such income, gains, losses, deductions, credits and other items arise after such effective date. To the extent consistent with Section 706(d) of the Code and Treasury Regulations promulgated thereunder, the Company's books may be closed at the time Additional Members are admitted (as though the Company's tax year had ended) or the Company may credit to the Additional Members pro rata allocations of the Company's income, gains, losses, deductions, credits and items for that portion of the Company's Fiscal Year after the effective date of the admission of the Additional Members.

(c)    For the avoidance of doubt, no Member may be added or removed as a Member of the Company without the unanimous consent of the Members.

**EXHIBIT 1**

Section 5.5.    <u>Amendments</u>. Any amendment to this Agreement or the Certificate shall be adopted and be effective as an amendment upon the approval of the Managers.

Section 5.6.    <u>Confidentiality Obligations of Members</u>. Each Member expressly covenants and agrees that neither such Member nor any of its Affiliates (to the extent any such Affiliate has received Confidential Information) will disclose, divulge, furnish or make accessible to anyone any Confidential Information, or in any way use any Confidential Information in the conduct of any business; provided, however, that nothing in this <u>Section 5.6</u> will prohibit the disclosure of any Confidential Information (i) which is required to be disclosed by the Member or any such Affiliate in connection with any court action or any proceeding before any judicial or similar authority or under any applicable law or regulation; (ii) in connection with the enforcement of any of the rights of the Member hereunder; (iii) to the extent required by securities laws; (iv) in connection with the defense by the Member of any claim asserted against it hereunder; or (v) as necessary to conduct the Company's business or to obtain loans for the Company; provided, however, that in the case of a disclosure contemplated by clause (i), to the extent reasonably practicable no disclosure shall be made until the Member shall give notice to the Company of the intention to disclose such Confidential Information so that the Company may contest the need for disclosure, and the Member will cooperate (and will cause its Affiliates and their respective representatives to cooperate) with the Company in connection with any such proceeding, all such cooperation at the expense of the Company.

## ARTICLE 6

## MANAGEMENT

Section 6.1.    <u>Management of the Company</u>.

(a)    <u>Management by the Managers</u>.    Except for matters for which approval by the Members is expressly required by the mandatory provisions of the Act, the business, property and day-to-day affairs of the Company shall be managed by or under the direction of the Managers.    Decisions of the Managers within their scope of authority shall be made by majority consent of the Managers which must include the consent of Williams.    Such decisions shall be binding upon the Company and each Member.    Except for matters for which approval by the Members is expressly required by the mandatory provisions of the Act, no Member shall have the right to vote on any matters concerning the business, property or affairs of the Company.

(b)    <u>Authorized Person, Company Signatory</u>. Williams shall have the sole right, power, and authority to transact any business in the name of the Company as a Manager or President, and to act for and on behalf of the Managers in such capacity, or to bind the Company in such matters. Williams and his representatives will meaningfully consult with the other Managers and Members and their representatives in a timely manner regarding the ongoing business of the Company.

(c)    <u>Managers Dispute and Tie-breaker</u>. In the event of any disagreement between the Managers as to any matter whatsoever respecting the business or operations of

## EXHIBIT 1

the Company (including, without limitation, intellectual property rights, licenses or assignments, its winding-up, dissolution or liquidation, any transfer of Membership Interests, or resolution of any tax matter) or this Agreement, which disagreement continues after good faith consultation between the Managers, the matter shall be determined by Williams, and Williams' determination of such matter shall be binding on the Company and the Members. Williams will use best efforts to obtain the approval of one of the other Managers in any vote regarding the business operations of Company prior to making a unilateral decision in the event of a dispute.

(d)     Reimbursement of Williams' Expenses Advanced on Behalf of N.E.R.D. The Company shall timely reimburse Williams for any and all reasonable and necessary good faith customary business-related expenses, fees, and costs advanced on behalf of the Company including, but not limited to, audio and video recording costs, equipment purchase and rental, and related staffing or personnel which shall be "off the top" before distribution of income (the "**PW Expenses**"), provided there will be no "self-dealing" and such PW Expenses shall be customary in the industry For the avoidance of doubt, all expenses referred to in this Section 6.1(c), whether incurred by Williams prior to or after the effective date of this Agreement, shall timely be paid prior to any distributions pursuant to Article 8 of this Agreement. No Member or Manager other than Williams may incur costs or expenses on behalf of the Company without the majority consent of the Managers, however, any and all PW Expenses may be incurred and reimbursed without the consent of the Managers or Members; provided, that the Managers and Members will each have the right to periodically (but not more than once per calendar year, and at that Manager or Member's own expense) to audit the income and expenses of Company. All Members shall be given on a monthly basis a statement indicating the Income and Expenses of the LLC for the preceding month. The Managers and Members shall be provided with copies of or access to all books and records of the LLC on an ongoing basis and shall be provided with copies of the underlying royalty statements from all third parties promptly after receipt by the LLC.

(e)     Withdrawal or Replacement.  Any Manager may withdraw and may be replaced by the affirmative vote of all of the Members. If there shall be more than one Manager at any time, the majority decision of the Managers shall be required for actions taken by the Managers hereunder.

(f)     Vacancies, Death of Manager. For purposes of estate planning and succession, any Manager may assign his or her duties as Manager and appoint any individual or trustee, acting on behalf of said Manager's trust, to act as Manager effective immediately upon the vacancy created as a result of the death of said Manager. Any assignment under this Section 6.2(b) shall be made by means of an inter vivos writing or will (whichever bears the later date), or, if no such successor Manager is appointed, the surviving Managers may, by majority vote, appoint a successor Manager.

(g)     No Management by Other Persons. Except as described in this Agreement, or as authorized by further action of the Managers or officers, agents, and employees empowered by the Managers as specified in Section 6.5 of this Agreement, or

**EXHIBIT 1**

as authorized by the unanimous consent of the Members, no Person shall take part in the management, the operation, or control of the business and affairs of the Company.

Section 6.2.    <u>Reliance by Third Parties</u>. Any Person dealing with the Company may rely upon a certificate signed by all Managers or Williams as President as to:

(a)    the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Managers in any other manner germane to the affairs of the Company;

(b)    the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(c)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

Section 6.3.    <u>Officers</u>. The Managers may, from time to time, designate one or more natural persons to be officers of the Company. No officer need be a resident of the State of Delaware or a Member. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to such officer. The Managers may assign titles to particular officers. Unless the Managers otherwise decides, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers. Each officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same individual. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.

## ARTICLE 7

## ASSIGNABILITY OF MEMBER INTERESTS

Section 7.1.    <u>Assignability of Interest</u>. Except as otherwise provided in this <u>Article 7</u> or as approved by the Managers, no Member may Transfer the whole or any part of its Interest or any fractional or beneficial interest therein. If a Member Transfers its Interest in accordance with this <u>Article 7</u>, such Transfer shall, nevertheless, not entitle the assignee to become a substitute Member or to be entitled to exercise or receive any of the rights, powers or benefits of a Member (including voting rights) other than the right to receive distributions to which the assigning Member would be entitled (such assignee, an "<u>Interest Holder</u>"), unless the assigning Member designates, in a written instrument delivered to the Managers, its assignee to become a substitute Member and the Managers' unanimous consent to the admission of such Interest Holder as a Member; and provided further, that such assignee shall not become a substitute Member without having first executed an instrument reasonably satisfactory to those Members that approved the Transfer which shall at a minimum include an acceptance and agreement by the substitute Member to abide by all the terms and conditions of this Agreement.

**EXHIBIT 1**

The Transfer shall be conditioned upon the Company receiving a fee from such assignee or the assigning Member sufficient to cover all reasonable expenses of the Company in connection with such assignee's admission as a substitute Member.

Section 7.2.    Permitted Transfers.

(a)    Notwithstanding the foregoing, a Member shall be permitted to Transfer the whole or any part of its Interest or any fractional or beneficial interest therein to any Permitted Assignee, subject to the rights articulated in Section 5.8. For this purpose "Permitted Assignee" means with respect to a particular Member or an Interest Holder, a Person that is (i) a spouse, natural or adoptive lineal ancestor or descendant of such Member or Interest Holder (a "Family Member"); (ii) a trust, estate, guardianship or custodianship, including those established under any of the Uniform Gifts to Minors Act of any state, established for such Member or Interest Holder, or one or more Family Members or other Permitted Assignees of such Member or Interest Holder; (iii) a Person that is under the control of or in common control with such Member or another Permitted Assignee of such Member; (iv) a partnership, limited liability company, trust or other entity that is owned directly or indirectly by any Person that is an Interest Holder of a Member as of the date of the Agreement and the Family Members or other Permitted Assignees of such Interest Holder; and (v) a Person succeeding to the interest of a Member or of any Interest Holder of a Member as the result of the death of any other Person by will or intestacy or distribution from a trust without any payment of consideration by such Person. The subsequent Transfer of any Interest by a Permitted Assignee shall be subject to the same restrictions of this Article 7 in the same manner as if the Interest to be Transferred was still owned by the Member from whom such Permitted Assignee acquired such Interest; and for this purpose references herein to a Transfer by a Member (or a specific Member), shall include any Transfer by the Permitted Assignee(s) that acquired such Member's Interest, and references to a specific Member by name shall include its Permitted Assignees.

(b)    If a Member Transfers all or a portion of its Interest in the Company to a Permitted Assignee, such Permitted Assignee shall not become a substitute Member without the unanimous approval of the Managers, but shall constitute an Interest Holder.

(c)    Notwithstanding Section 7.2 (a), in the event of a death of a Member during the duration of this Agreement, nothing shall prevent a Member from appointing any Person as a surviving Interest Holder in lieu of Member's heirs by means of an inter vivos writing or will.

Section 7.3.    Recognition of Assignment by Company or Other Members. No Transfer of Interest that is in violation of this Article 7 shall be valid or effective, and the Company shall not recognize the same for any purpose of this Agreement, including the purpose of making distributions of Net Cash Flow pursuant to this Agreement with respect to such Interest or part thereof. No liability shall be incurred as a result of refusing to make any such distributions to the assignee of any such invalid assignment.

**EXHIBIT 1**

Section 7.4.    <u>Effective Date of Assignment</u>. Any valid Transfer of a Member's Interest, or part thereof, pursuant to the provisions of this <u>Article 7</u> shall be effective as of the close of business on the day preceding the closing of the transaction evidencing the Transfer. The Company shall, from the effective date of such Transfer, thereafter pay all further distributions on account of the Interest (or part thereof), so assigned, to the assignee of such Interest, or part thereof. As between any Member and its assignee, the profits and losses of the Company for federal, state and local income tax purposes for the Fiscal Year of the Company in which such assignment occurs shall be apportioned for federal income tax purposes in accordance with any convention permitted under Section 706(d) of the Code and selected by the Managers.

Section 7.5.    <u>Limitations on Transfer</u>. No Transfer of Interest may be effectuated unless in the opinion of the Company's counsel the Transfer (a) would not result in the close of the Company's tax year or the termination of the Company within the meaning of Section 708(b) of the Code; (b) would comply with the Securities Act of 1933 and applicable securities laws of any other jurisdiction; and (c) would not violate any other applicable laws, provided that the provisions of this <u>Section 7.5</u> may be waived by the Managers.

# ARTICLE 8

## DISTRIBUTIONS TO MEMBERS

Section 8.1.    <u>Net Cash Flow</u>. Net Cash Flow shall be distributed as approved by the Managers, in their sole discretion. Except as otherwise provided in this <u>Article 8</u>, all distributions of Net Cash Flow, other than upon a liquidation of the Company, shall be made to the Members as follows:

(a)    First, to the Members in accordance with each Member's Unrecovered Capital until the Unrecovered Capital of all Members is zero; and

(b)    Second, with regard to disbursements resulting from a Member's Services under Section 2.7 specifically as a result of touring and live performances, or with respect to the sale or exploitation of recordings embodying the performances of the Group, or any other Net Cash Flow from activities not otherwise specified herein (including without limitation, sponsorship or endorsement), to Williams 50%, to Hugo 25% , and to Haley 25%; and

(c)    Third, with regard to disbursements resulting from the sales of merchandise relating to the Group or exploitation or sale by the Company of Williams's N*E*R*D trademarks to the Members equally.

Wherever possible, Net Cash Flow from performances, touring, exploitations of recordings, merchandise and trademarks will be calculated separately and will not be crossed.

Section 8.2.    <u>Tax Distributions</u>. Upon the approval of the Managers, and subject to any agreements to which the Company is subject, to the extent Net Cash Flow is available, the total distributions ("<u>Minimum Distributions</u>") to a Member for each Fiscal Year (and the 90-day period following such Fiscal Year) shall not be less than an amount equal to the

**EXHIBIT 1**

product of (x) the Company's net taxable income allocated to such Member for such Fiscal Year and all prior Fiscal Years for federal income tax purposes, multiplied by (y) the highest marginal federal tax rate for an individual ordinary income or capital gain, as the case may be, including, without limitation, Medicare tax, plus the rate of state tax, if any, for their respective residents, reduced by all prior distributions pursuant to Section 8.1, regardless of the actual federal tax rates applicable to the Members. The Company will use reasonable best efforts to cause such distributions to be made in a manner which permits such Member to use the proceeds of such distributions to make on a timely basis all required estimated payments of income taxes in respect of the taxable income so allocated to them (including as soon as is reasonably feasible following the end of each calendar quarter, but in no event later than January 10, April 10, June 10 and September 10 of each calendar year). To the extent that such Minimum Distributions requirement increases the amount of distributions beyond the amount to which a Member would be entitled in the absence thereof, the excess portion shall be considered a prepayment of future distributions allocable to such Member; provided that adjustments to any such future distributions to that Member shall not decrease his aggregate distributions below an amount necessary to meet the Minimum Distribution requirement for such Member for subsequent Fiscal Years. If upon termination of a Member's Interest in the Company, such Member shall have received distributions pursuant to this Section 8.2 in excess of the Member's net tax liability as computed herein, such Member shall contribute such excess to the Company within ten (10) days of termination of his Interest.

Section 8.3.  Withholding. All amounts withheld pursuant to the Code or any provision of any foreign, state or local tax law or treaty with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Article 8 for all purposes of this Agreement. The Company is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, foreign, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, foreign, state or local law or treaty and shall allocate such amounts to those Members with respect to which such amounts were withheld.

Section 8.4.  Limitations on Distribution. Except as provided in this Agreement, no Member shall be entitled to any distribution of cash or other property from the Company. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of its Interest in the Company if such distribution would violate the Act or other applicable law.

## ARTICLE 9

## TAX ALLOCATIONS

Section 9.1.  Profits and Losses. All Profits and Losses from operations for each Fiscal Year (or part thereof), as determined by the Company's accountants, shall be allocated as follows:

(a)  For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such

**EXHIBIT 1**

Fiscal Year and all special allocations pursuant to Section 9.2 with respect to such Fiscal Year, all Profits and Losses (other than special allocations specially allocated pursuant to Section 9.2) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be distributed to such Member, determined as if the Company were to sell all of its assets for the Gross Asset Value thereof, pay all liabilities allocable to such assets according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Value of the assets securing such liability) and distribute the proceeds thereof pursuant to Section 13.4, hereof, minus (b) the sum of (i) such Member's share of Company Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according to Treasury Regulation Section 1.704 2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

(b)     Notwithstanding anything to the contrary in this Section 9.1, the amount of items of Company expense and loss allocated pursuant to this Section 9.1 to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any taxable year. All such items in excess of the limitation set forth in this Section 9.1 (b) shall be allocated first to Members who would not have an Adjusted Capital Account Deficit, pro-rata in proportion to their Capital Account balances as adjusted in accordance with the definition of Adjusted Capital Account Deficit.

Section 9.2.     Special Allocations The following special allocations shall be made in the following order:

(a)     If there is a net decrease in Company Minimum Gain during a Company fiscal year so that an allocation is required by Treasury Regulations Section 1.704-2(f), then each Member shall be specially allocated items of income and gain for such year (and, if necessary, subsequent fiscal years) equal to such Member's share of the net decrease in Company Minimum Gain as determined by Treasury Regulations Section 1.704-2(g). Such allocations shall be made in a manner and at a time which will satisfy the minimum gain chargeback requirements of Treasury Regulations Section 1.704-2(f) and this Section shall be interpreted consistently therewith.

(b)     If there is a net decrease in the Member Nonrecourse Debt Minimum Gain during any Company fiscal year, any Member who has a share of such Member Nonrecourse Debt Minimum Gain (as determined in the same manner as partner nonrecourse debt minimum gain under Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of income or gain for such year (and, if necessary, subsequent fiscal years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Treasury Regulations Section 1.704-2(i)(4). This Section shall be interpreted in a manner consistent with such Treasury Regulations.

**EXHIBIT 1**

(c)    If a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), any of which causes or increases an Adjusted Capital Account Deficit in such Member's Capital Account, then such Member will be specially allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance created or increased by such adjustment, allocation, or distribution as quickly as possible; provided, however, an allocation pursuant to this Section 9.2(c) will be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 9 have been tentatively made as if this Section 9.2(c) were not in the Agreement.

(d)    Deductions attributable to any Company Nonrecourse Liability, as defined in accordance with Section 1.704-2(b)(3) of the Treasury Regulations shall be allocated among the Members in proportion to their respective Percentage Interests.

(e)    Deductions attributable to any Member Nonrecourse Debt shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(f)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if such gain or loss increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(g)    If any Member makes a loan to the Company, or the Company makes a loan to any Member, and interest in excess of the amount actually payable is imputed under Code Sections 7872, 483, or 1271 through 1288 or corresponding provisions of subsequent Federal income tax law, then any item of income or expense attributable to any such imputed interest shall be allocated solely to the Member who made or received the loan and shall be credited or charged to its Capital Account, as appropriate.

(h)    In the event that a guaranteed payment to a Member is ultimately re-characterized (as the result of an audit of the Company's return or otherwise) as a distribution for federal income tax purposes, and if such re-characterization has the effect of disallowing a deduction or reducing the adjusted basis of any asset of the Company or a Member, then an amount of Company gross income equal to such disallowance or reduction shall be allocated to the recipient of such payment. In the event that a distribution to a Member is ultimately re-characterized (as a result of an audit of the Company's return or otherwise) as a guaranteed payment for federal income tax purposes, and if any such re-characterization gives rise to a deduction, such deduction shall be allocated to the recipient of the distribution.

**EXHIBIT 1**

(i)    For purposes of calculating a Member's share of "excess nonrecourse liabilities" of the Company (within the meaning of Treasury Regulation Section 1.752-3(a)(3)), the Members intend that they be considered as sharing profits of the Company in proportion to their respective Percentage Interests.

(j)    The allocations set forth in this <u>Section 9.2</u> (collectively the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations Section 1.704-1 and Section 1.704-2. Notwithstanding any other provisions of this Article 9 (other than the Regulatory Allocations), the Members shall, with the advice and assistance of the Company's tax accountants, take the Regulatory Allocations into account in allocating other Profits, Losses, and items of income, gain, loss, deduction and Code Section 705(a)(2)(B) expenditures among the Members so that, to the extent possible, the net amount of such allocations of other Profits, Losses, and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

Section 9.3.    <u>Allocation and Other Rules.</u>

(a)    In the event Members are admitted to the Company pursuant to this Agreement on different dates, the Profits (or Losses) allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to their Interests during such Fiscal Year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers.

(b)    For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Managers using any method that is permissible under Section 706 of the Code and the Treasury Regulations thereunder.

(c)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits and Losses for the Fiscal Year in question.

(d)    Income, gain, loss or deduction with respect to any property contributed by a Member shall, solely for tax purposes, be allocated among the Members, to the extent required by Code Section 704(c) and the related Treasury Regulations under Code Sections 704(b) and 704(c), to take account of the variation between the adjusted tax basis of such property and its Gross Asset Value at the time of its contribution to the Company. If the Gross Asset Value of any Company property is adjusted, as provided in Treasury Regulations Section 1.704-1(b)(2)(iv), then subsequent allocations of income, gain, loss and deduction shall be as provided in Code Section 704(c) and the related Treasury Regulations. Allocations under this <u>Section 9.3(d)</u> shall be made in accordance with the traditional method set forth in Treasury Regulation Section 1.704-3(b) and are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions under any provision of this Agreement.

**EXHIBIT 1**

(e)    All other tax elections required or permitted by law or Treasury Regulation or similar state or local rule or regulation shall be made by the consent of the Managers. The Members are aware of the income tax consequences of the allocations made by this Article 9 and hereby agree to be bound by the provisions of this Article 9 in reporting their shares of Company income and loss for income tax purposes.

If any Member's Capital Account is not equal to the amount to be distributed to such Member pursuant to Section 13.4, individual items of gross income or loss for the Fiscal Year in which the Company is dissolved shall be allocated among the Members in such a manner as to cause, to the extent possible, each Member's Capital Account to be equal to the amount to be distributed to such Member pursuant to Section 13.4.

## ARTICLE 10

## BOOKS AND RECORDS

Section 10.1.  Inspection Rights Pursuant to Law. The Company shall have obligations to the Members only as set forth in this Article 10 respecting books, records and financial statements of the Company.

Section 10.2.  Books and Records. At all times during the continuance of the Company, the Company shall maintain at its registered office and principal place of business all records and materials the Company is required to maintain at such location under the Act.

Section 10.3.  Annual Financial Statements. Within one hundred twenty (120) days after the end of each Fiscal Year, the Company shall cause to be delivered to each Member a financial statement of the Company for the prior Fiscal Year, prepared at the expense of the Company, which financial statement shall set forth, as of the end of and for such Fiscal Year, the following:

(a)    a profit and loss statement and a balance sheet of the Company;

(b)    the balance in each Member's Capital Account; and,

(c)    such other information as reasonably shall be necessary for the Class A and Class B Members to be advised of the financial status and results of operations of the Company.

Section 10.4.  Quarterly Statements. As unanimously determined by the Managers, the Company may provide the Members quarterly operating statements and reports of the financial condition of the Company in such form as reasonably and unanimously determined by the Managers for each quarter that shall be submitted to the Members within sixty (60) days after the end of each such quarter.

Section 10.5.  Accounting Method. For both financial and tax reporting purposes and for purposes of determining Profits and Losses, the books and records of the Company shall be kept on the cash or accrual method of accounting as unanimously determined

**EXHIBIT 1**

by the Managers and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

## ARTICLE 11

## TAX MATTERS

Section 11.1. <u>Taxation as Partnership</u>. The Company shall be treated as a partnership for U.S. federal income tax purposes. The Members intend that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the Federal Bankruptcy Code.

Section 11.2. <u>Federal Tax Returns</u>. The Company shall cause the Company's independent public accountants to prepare, at the expense of the Company, for each Fiscal Year (or part thereof), Federal tax returns in compliance with the provisions of the Code and any required state and local tax returns.

Section 11.3. <u>Member Tax Return Information</u>. The Company, at its expense, shall cause to be delivered to each Member not later than April 1 of the subsequent year such information as shall be necessary (including a statement for that year of each Member's share of net income, net losses and other items of the Company) for the preparation by the Members of their Federal, state and local income and other tax returns.

Section 11.4. <u>Tax Matters Member.</u>

(a)     The "Tax Matters Member" of the Company for purposes of Section 6231(a)(7) of the Code shall be Williams. The Members shall direct the Tax Matters Member with respect to any administrative proceeding at the Company level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes. The Tax Matters Member may settle any controversies with the Internal Revenue Service.

(b)     The Tax Matters Member shall, within five (5) business days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Company level relating to the determination of any Company item of income, gain, loss, deduction or credit, mail a copy of such notice to each Member.

Section 11.5. <u>Partnership Tax Audit Rules</u>.

(a)     For tax years commencing after December 31, 2016, the Tax Matters Member or any other Person designated by the Managers shall be designated as the "partnership representative" of the Company for purposes of the Partnership Tax Audit Rules, and the Tax Matters Member (or any other Member designated by the Managers) is authorized to take (or cause the Company to take) such other actions as may be necessary pursuant to Treasury Regulations or other guidance to cause the Managers (or any Member selected by the Managers) to be designated as the "partnership representative" and each Member agrees to consent to such designation to the extent requested by the Managers (or any other Member designated by the Managers). The Partnership Representative shall

**EXHIBIT 1**

inform the Members and the Managers of all administrative and judicial proceedings pertaining to the determination of the Company's tax items and will provide the Members and the Managers with copies of all notices received from the Internal Revenue Service regarding the commencement of a Company-level audit or a proposed adjustment of any of the Company's tax items. The Partnership Representative may extend the statute of limitations for assessment of tax deficiencies against the Members attributable to any adjustment of any tax item. The Company will reimburse the Partnership Representative for reasonable expenses properly incurred while acting within the scope of the authority of the Partnership Representative, as applicable.

(b)     Except as otherwise provided herein, if the Company is required by law (as determined by the Company's legal and accounting advisors) to make any payment on behalf of a Member (e.g., federal withholding taxes not related to employment or any taxes arising under the Partnership Tax Audit Rules), then such Member shall indemnify the Company in full for the entire amount paid (including interest, penalties, and related expenses), which such obligation to indemnify under this Section 11.5 shall survive the Transfer, forfeiture or other disposition of such indemnifying Member's ownership interest in the Company. The Company may offset Distributions to which a Member is otherwise entitled hereunder against such Member's obligation to indemnify the Company under this Section 11.5.

(c)     The Managers shall attempt to allocate the burden of (or any diminution in distributable proceeds resulting from) any taxes, penalties or interest imposed on the Company pursuant to the Partnership Tax Audit Rules to those Members to whom such amounts are specifically attributable (whether as a result of their status, actions, inactions or otherwise) where such allocation can be achieved without unwarranted expense and effort (as measured in relation to the aggregate amount in question) as determined by the Managers, provided that nothing in this Section 11.5 shall be construed to modify or replace the obligations of any Member pursuant to this Agreement, and provided further that under no circumstances shall the Managers be liable for any such amounts.

Section 11.6.  Right to Make Section 754 Election. At the request of any Member, the Company shall make an election in accordance with Section 754 of the Code, so as to adjust the basis of Company property in the case of a distribution of property within the meaning of Section 734 of the Code, and in the case of a transfer of a Company Interest within the meaning of Section 743 of the Code. In the case of a Transfer of an Interest, the incremental costs incurred by the Company as a result of the Section 754 election shall be borne by the transferring Member, unless the transfer is a result of default by the transferee, in which case the transferee shall bear such costs.

**EXHIBIT 1**

## ARTICLE 12

### LIABILITY, EXCULPATION AND INDEMNIFICATION

Section 12.1.  Liability.

(a)     Except as otherwise provided by the Act, any other provision of this Agreement, including, without limitation, Section 12.7, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)     Except as otherwise expressly required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions; (ii) its share of any assets and undistributed profits of the Company; (iii) its obligation to make other payments expressly provided for in this Agreement; and (iv) the amount of any distributions wrongfully distributed to it.

Section 12.2.  Exculpation.

(a)     No Covered Person shall, to the fullest extent permitted by law, be liable to the Company or any other Covered Person for any loss, damage, claim, liability, demand, action, suit, proceeding or right of action (collectively "Damages") incurred by reason of any act or omission performed or omitted by such Covered Person, except that a Covered Person shall be liable for any Damages incurred by reason of such Covered Person's (i) breach of the duty of loyalty solely in his or her capacity as an officer of the Company, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which such Covered Person derived an improper personal benefit solely in his or her capacity as an officer of the Company, in each case as described in clauses (i) through (iii), other than in connection with or as a result of a Permitted Action (each, a "Non-Exculpated Action"). A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits or Losses or Net Cash Flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(b)     To the fullest extent permitted by law, a Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Covered Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the

EXHIBIT 1

value and amount of the assets, liabilities, Profits or Losses or Net Cash Flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(c)    The provisions of this Section 12.2, to the extent that they eliminate or restrict the duties and/or liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and/or liabilities of such Covered Person to the fullest extent permitted by applicable law.

Section 12.3.  Indemnification.  All Covered Persons shall be entitled to indemnification from the Company for any Damages incurred by such Person by reason of any act or omission performed or omitted by such Person provided that: (i) any such action was undertaken in good faith on behalf of the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company; (ii) any such action was reasonably believed to be within the scope of authority conferred on such Person by this Agreement; and (iii) with respect to any criminal action or proceeding, such Person had no reasonable cause to believe his action or omission was unlawful, except that no Person shall be entitled to be indemnified in respect of any Damages incurred by such Person by reason of fraud, gross negligence or willful misconduct with respect to such acts or omissions or for any Damages for which it has obligations to indemnify under Section 12.7; provided, however, that any indemnity under this Section 12.3 shall be provided out of and to the extent of Company assets only (including the proceeds of any insurance policy obtained pursuant to Section 12.5 hereof), and no Person shall have any personal liability on account thereof, including without limitation, any obligation to contribute money or other property to the Company .

Section 12.4.  Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Person described in Section 12.3 in defending any against any claim, demand, action, suit or proceeding that would result in Damages shall, from time to time, be advanced by the Company prior to the final disposition of such claim for Damages upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 12.3 hereof.

Section 12.5.  Insurance.  The Company may purchase and maintain insurance on behalf of Covered Persons and such other Persons against any Damages that may be asserted against or that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such Damages under the provisions of this Agreement. The Company may enter into indemnity contracts with Covered Persons and such other Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 12.4 hereof and containing such other procedures regarding indemnification as are appropriate.

Section 12.6.  Certain Liabilities.  Each Member agrees to be liable for the Capital Contributions required to be made by such Member.

**EXHIBIT 1**

Section 12.7.  <u>Acts Performed Outside the Scope of the Company</u>. Each Member (the "Indemnitor") shall indemnify, defend, save and hold harmless the other Member (the "Indemnitee") from any and all Damages suffered by the Company in connection with any lawsuits or similar proceedings brought against the Company by a non-Member third party that arise by virtue of any act or thing done or omitted to be done by the Indemnitor (directly or through agents or employees) outside the scope of, or in breach of, the terms of this Agreement; provided, however, that the Indemnitor shall be properly notified of the existence of the asserted Damages, and shall be given reasonable opportunity to cure any act or omission causing Damages, and participate in the defense thereof. The Indemnitee's failure to give such notice shall not affect the Indemnitor's obligations hereunder, except to the extent of any actual prejudice arising therefrom.

Section 12.8.  <u>Liability of Members to Company</u>. Unless otherwise provided in this Agreement, no Member shall be liable to any other Member or to the Company by virtue of being a Member of the Company.

Section 12.9.  <u>Attorneys' Fees</u>. All of the indemnities provided in this Agreement shall include reasonable attorneys' fees, including appellate attorneys' fees and litigation expenses, and court costs.

Section 12.10. <u>Subordination of Other Rights to Indemnity</u>. The interests of the Members in any proceeds of the Company by way of repayment of loans, return of any Capital Contributions, or any distributions from the Company, shall be subordinated to the right of Members to the indemnities provided by this Article 12.

Section 12.11. <u>Survival of Indemnity Provisions</u>. Except as otherwise specifically provided herein, all of the indemnity provisions contained in this Agreement shall survive a Member's ceasing to be a Member hereunder.

## ARTICLE 13

## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 13.1.  <u>No Dissolution</u>. The Company shall not be dissolved by the admission of additional Members or substitute Members in accordance with the terms of this Agreement, or the withdrawal of a Member.

Section 13.2.  <u>Events Causing Dissolution</u>. The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

(a)    the agreement by majority consent of the Managers which must include the consent of Williams to the dissolution of the Company;

(b)    at such time as there are no Members;

(c)    the entry of a decree of judicial dissolution under the Act; or

(d)    on the sale of all or substantially all of the assets of the Company.

**EXHIBIT 1**

Section 13.3.  <u>Notice of Dissolution</u>. Upon the dissolution of the Company, the Members shall be notified of such dissolution.

Section 13.4.  <u>Liquidation</u>. Upon dissolution of the Company, the Managers (in such capacity, the "Liquidating Trustee") shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. During the period of winding up all of the provisions of this Agreement shall remain in full force and effect, other than those provisions that are clearly inconsistent with the winding up process, such as distributions in accordance with <u>Section 8.1</u>. No Member may take any action during the winding up period not otherwise permitted by this Agreement. The proceeds of liquidation shall be distributed in the following order and priority:

(a)  first, to payment of all expenses and debts of the Company and purchasing insurance policies that will provide for any contingent liabilities or obligations of the Company, the amount of such insurance to be based on the experience of the Company for such liabilities and obligations; provided that the unpaid principal of and interest on any loans made to the Company by Members (and their Affiliates), shall be distributed pro rata to the Members (and their Affiliates) who made such loans, in proportion to the total amount of principal and interest payable on such loans, such distributions being treated first as a payment of accrued interest on such loans and next as in payment of principal on such loans; and

(b)  second, the balance to the Members in accordance with <u>Section 8.1</u>.

Section 13.5.  <u>Termination</u>. The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article 13 and the Certificate shall have been canceled in the manner required by the Act.

Section 13.6.  <u>Claims of the Members or Third Parties</u>. The Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member; provided, however, that nothing contained herein shall be deemed to limit the rights of a Member under applicable law. In the event any Member has a deficit balance in its Capital Account at the time of the Company's dissolution, it shall not be required to restore such account to a positive balance or otherwise make any payments to the Company or its creditors or other third parties in respect of such deficiency.

Section 13.7.  <u>Distributions In-Kind</u>. If any assets of the Company shall be distributed in kind, such assets shall be distributed to the Member(s) entitled thereto as tenants-in-common in the same proportions as such Member(s) would have been entitled to cash distributions if (i) such assets had been sold for cash by the Company at the book value of such property (taking Code Section 7701(g) into account) on the date of distribution; (ii) any

**EXHIBIT 1**

unrealized income, gain, loss and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) that would be realized by the Company from such sale were allocated among the Member(s); and (iii) the cash proceeds were distributed to the Member(s) in accordance with this <u>Article 13</u>. The Capital Accounts of the Member(s) shall be increased by the amount of any unrealized income or gain inherent in such property or decreased by the amount of any loss or deduction inherent in such property that would be allocable to them, and shall be reduced by the fair market value of the assets distributed to them under the preceding sentence.

ARTICLE 14

**REPRESENTATIONS AND WARRANTIES OF MEMBERS**

Section 14.1. <u>Representations and Warranties of Members</u>. As of the date of this Agreement, each Member hereby makes each of the representations and warranties applicable to such Member as set forth below, and such warranties and representations shall survive the execution of this Agreement. Each Member hereby represents and warrants that:

(a)    If such Member is a corporation, partnership or limited liability company, it is duly organized or duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation. Such Member has the "corporate" authority to execute and deliver this Agreement and to perform its obligations hereunder and, if such Member is a corporation, partnership or limited liability company, the execution, delivery, and performance of this Agreement has been duly authorized. This Agreement constitutes the legal, valid, and binding obligation of such Member.

(b)    Neither the execution, delivery, and performance of this Agreement nor such Member's performance of and compliance with the terms and provisions (i) will conflict with, violate, or result in a breach of any of the terms, covenants, conditions, or provisions of any law or governmental regulation in effect on the date hereof applicable to, or any order, writ, injunction, decree, determination, or award of any court, any governmental department, Managers, agency, or instrumentality, domestic or foreign, or any arbitrator, directed to, or binding on such Member or any of its Affiliates, which conflict, violation, or breach would have a material adverse effect on the business, operations, properties or condition (financial or otherwise) of the Company, or (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, or operating agreement of such Member or any of its Affiliates or of any agreement or instrument to which such Member or any of its Affiliates is a party or by which such Member or any of its Affiliates is or may be bound or to which any of its properties or assets is subject, which conflict, violation, breach, or default would have a material adverse effect on the business, operations, properties or condition (financial or otherwise) of the Company.

(c)    Such Member is acquiring its interest in the Company based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis,

**EXHIBIT 1**

and expertise. Each Member expressly acknowledges (i) that it has received no assurances from anyone, including the other Member, that it will receive any return on its Capital Contribution, and (ii) that the Member is aware that it may lose all of its Capital Contributions. Such Member's acquisition of its interest in the Company is being made for its own account for investment and not with a view of the sale or distribution thereof.

## ARTICLE 15

## MISCELLANEOUS

Section 15.1.  Notices. All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be hand-delivered, emailed, telecopied, faxed, or mailed by registered or certified mail or by recognized overnight delivery or courier service (e.g., Federal Express), as follows:

(i)       if given to the Company at the principal place of business of the Company set forth in Section 2.4 hereof.

(ii)      if given to any Member, at such address, including email address, as set forth in Schedule A or at address, including email address, as such Member may hereafter designate by written notice to the Company.

Section 15.2.  Failure to Pursue Remedies. The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 15.3.  Cumulative Remedies. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 15.4.  Binding Effect. This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

Section 15.5.  Interpretation. Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement.

Section 15.6.  Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 15.7.  Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument.

4112.335/1242947.1                                      33

**EXHIBIT 1**

Section 15.8. <u>Integration</u>. This Agreement and the Schedules to the Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

Section 15.9. <u>Governing Law</u>. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws unless otherwise determined by the unanimous consent of the Managers.

Section 15.10. <u>Third Party Beneficiaries</u>. Nothing expressed or implied in this Agreement is intended or shall be construed, to confer upon or give any person, firm or corporation other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in their being deemed a third party beneficiary of this Agreement.

Section 15.11. <u>Effect of Waiver or Consent</u>. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 15.12. <u>Election to Arbitrate</u>. Each party to this Agreement agrees that any action, suit or proceeding arising out of or relating to this Agreement or the breach or threatened breach of this Agreement may be arbitrated. Any election of arbitration must be made by the unanimous consent of the Managers. For purposes of this Section 15.14, an agreed mediation or arbitration service located in Los Angeles, California shall provide arbitration services unless otherwise determined by the majority of the Managers. Nothing in this arbitration provision shall limit the right of a party to seek an order from a court of competent jurisdiction dismissing any litigation brought in violation of this provision. In the event such an order is sought and obtained, the non-prevailing party shall pay all reasonable attorney's fees and expenses of the prevailing party. This arbitration provision does not prevent or bar any non-consenting Manager or Member from commencing any action, suit or proceeding as pursuant to <u>Sections 15.12</u> of this Agreement.

Section 15.13. <u>Legal Counsel and Conflict Waiver</u>. Each Member acknowledges, agrees represents, and warrants that each has been advised by his respective legal counsel with respect to this Agreement and is familiar with the provisions, rights, and consequences of the terms herein. Each member further acknowledges and agrees that King Holmes Paterno & Soriano LLP may represent Williams in connection with legal work or issues arising in connection with the Company and its operations and may not be acting as the legal counsel of any other individual Member. Each Member further recognizes and accepts that its interest with respect to any such matter may be adverse to the interests of the other Members and of the Company. Each Member nevertheless consents to the representation of the Company by the aforementioned legal counsel, with respect to such matters and waives for the benefit of each

EXHIBIT 1

other Member and of such counsel any potential or actual conflict of interest between or among such Members and between any such Members and the Company. Each Member acknowledges that in the event of any future dispute or litigation between or among the Members and/or between any of the Members and the Company, the aforementioned legal counsel, may continue to represent Williams and/or the Company notwithstanding any such dispute and its prior representation of the Company or any Member.

*[Signature page follows]*

**EXHIBIT 1**

**IN WITNESS WHEREOF**, undersigned, being all of the initial Members of the Company, do hereby ratify, confirm and approve the adoption of this Agreement as the Operating Agreement of the Company, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement.

**MEMBERS:**

_____
PHARRELL WILLIAMS

_____
CHAD HUGO

_____
SHELDON HALEY

*Signature page to N.E.R.D. MUSIC, LLC Amended and Restated Operating Agreement*

**EXHIBIT 1**

*[Signature page follows]*

**EXHIBIT 1**

**IN WITNESS WHEREOF**, undersigned, being all of the initial Members of the Company, do hereby ratify, confirm and approve the adoption of this Agreement as the Operating Agreement of the Company, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement.

**MEMBERS:**


_____
**PHARRELL WILLIAMS**


_____
**CHAD HUGO**


_____
**SHELDON HALEY**


*Signature page to N.E.R.D. MUSIC, LLC Amended and Restated Operating Agreement*


4112.335/1242947.1                              38

**EXHIBIT 1**

**SCHEDULE A**

| Member | Units | Percentage Interest | Percentage Touring & Other Income | Percentage Merchandise & Trademark Income |
|---|---|---|---|---|
| Pharrell Williams | 5,100 Class A Units | 50.0% | 50% | 33.3% |
| Chad Hugo | 2,450 Class A Units | 25% | 25% | 33.3% |
| Sheldon Haley | 2,450 Class A Units | 25% | 25% | 33.3% |

4112.335/1242947.1

**EXHIBIT 1**